v.

**James SMITH and Isabelle Smith, Respondents.**

**No. WD 45316.**

Missouri Court of Appeals, Western District.

May 12, 1992.

Before SHANGLER, P.J., and KENNEDY and SMART, JJ.

### ORDER

**Ronnie Len HEWITT and Helen Maxine Hewitt, Plaintiffs–Appellants,**

v.

**EMPIREGAS, INC. OF SIKESTON and Empire Gas Corporation, Defendants–Respondents.**

**No. 17536.**

Missouri Court of Appeals, Southern District, Division Two.

May 14, 1992.

Motion for Rehearing or to Transfer to Supreme Court Denied June 5, 1992.

Application to Transfer Denied July 21, 1992.

Sikeston (Sikeston) and Empire Gas Corporation (Empire Gas) to recover damages for the wrongful death of their full-term unborn daughter. Their action was based upon the failure of the defendants to warn them of a defect in the LP gas storage tank owned by the plaintiffs. A jury returned verdicts in favor of the defendants. On appeal, the plaintiffs' only contention is the trial court erred in refusing to admit evidence that an employee of Sikeston placed a plastic cup over the vent on the regulator on the storage tank. The following is an outline of facts sufficient for consideration of that point.

Plaintiffs bought a farm home in 1987. Fuel for a floor furnace and gas range was supplied from a 500–gallon LP gas storage tank. The storage tank was manufactured in 1954. The service line connection and the regulator to reduce and control the pressure of the gas were located in the center at the top of the tank. A relief valve, to prevent a buildup of excessive pressure in the tank, was also in this location. The tank had a hood which covered the area. The hood was made with a hole in the top. The purpose of the hole was to permit the escape of the gas in the event the relief valve erupted. There was no "rain cap" over the vent. The tank did not conform to current standards.

There is no evidence concerning when the tank was installed to serve plaintiffs' farm home. The storage tank was in place when the plaintiffs purchased the farm and was included in that purchase.

The plaintiffs moved into the farm home in October 1987. During the time they lived there, they bought LP gas from Sikeston. The tank was filled on January 6, 1989. Exhibit 34, which has not been filed with this court, is purported to show Sikeston serviced the tank seven times between October 1987 and March 1989. Sikeston is a Missouri corporation, wholly owned by Empire Gas.

On March 6, 1989, the Sikeston area was covered with ice from sleet and freezing rain that had fallen during the night. That morning, Ronnie Hewitt awoke with a

Phillip J. Barkett, Jr., Dempster, Barkett & McClellan, Sikeston, for plaintiffs-appellants.

Steven G. Emerson, Thomas H. Davis, Melody L. Nashan, Watson, Ess, Marshall & Enggas, Kansas City, Manuel Drumm, II, Sikeston, for defendants-respondents.

MAUS, Judge.

Plaintiffs Ronnie Len Hewitt and Helen Maxine Hewitt, his wife, brought this action against defendants Empiregas, Inc. of

headache but left the house to warn his parents about the weather conditions. After returning home, he began feeling worse and called in sick to work. Helen Hewitt also began feeling ill with what she believed to be the flu. The furnace was running that day.

Because plaintiffs were ill, Ronnie Hewitt's mother, Brenda Hewitt, and sister, Misty Hewitt, went to plaintiffs' residence to help them. Sometime before noon, Brenda Hewitt decided to cook a pizza. When the stove did not come on immediately, she noticed that the pilot light was out and lit the pilot light with a match. When she again turned on the oven, the flames "shot all the way out to the edge of the oven," then went out when she turned the oven off. The same thing happened when Ronnie Hewitt attempted to turn on the oven. No further efforts were made to use the oven that day.

On the morning of March 7, 1989, Brenda Hewitt and her father drove Ronnie Hewitt to the emergency room because his illness had progressed to the point he was delirious. Before they left, Helen Hewitt by telephone spoke with Nancy Berry, a friend who was the office manager of Sikeston.

John Holder, the retail manager, was in the office when Ms. Berry was speaking with Helen Hewitt. Ms. Berry relayed to Holder that the Hewitts had an odor in the house, the oven was burning high and that Ronnie Hewitt was sick. Holder spoke with Ronnie Hewitt on the phone and was told by him that he had been sick for two or three days with headaches and nausea. Holder suspected the furnace was malfunctioning and told Ronnie Hewitt that he would come to the house to check it. Holder told the office manager to call the Hewitts back and tell them to leave the house until he found out what was wrong.

Ronnie Hewitt was taken to the hospital, where he was admitted. Helen Hewitt was pregnant with a child expected March 11, 1989. She went to see her obstetrician, who hospitalized her when no fetal heartbeat was detected. Helen Hewitt subsequently delivered a stillborn baby. It was determined that the death was the result of maternal carbon monoxide poisoning.

Holder went to the Hewitt home on March 7, 1989, to inspect the LP gas system. He tested the propane line pressure at the cooking range and determined that the pressure was within the normal range, and that the top burners operated normally. Holder also operated the furnace, which burned normally. He found the vent on the regulator partially covered with ice.

Holder went back to the Hewitt house with Charles Logsdon, another employee of Sikeston, on March 9, 1989. Holder and Logsdon turned on the furnace, and, after it burned about five or ten minutes, Logsdon smelled something and experienced a burning in his eyes. On a subsequent visit, Logsdon looked under the Hewitt house and observed that the vent pipe was sloped so that it was two or three inches higher at the furnace end than it was at the point where the vent pipe went into the flue.

Plaintiffs presented evidence that tended to show the tank and regulator system was defective because of the hole in the dome which otherwise covered the regulator on top of the tank; that the regulator had no rain cap; the hole allowed freezing rain to enter and the vent on the regulator froze, causing the regulator to malfunction, resulting in excessive amounts of carbon monoxide being discharged into the Hewitt residence.

The defendants introduced evidence that tended to show the hole did not make the tank unreasonably dangerous; the presence of the carbon monoxide in the home was the result of improper floor venting of the floor furnace, combined with a cracked heat exchanger; and a frozen vent on the tank's regulator would not cause the gas line to be overpressurized.

Ronnie Hewitt testified that when he returned home on March 9 or March 10, 1989, he found the dome partially raised and a plastic cup over the vent on the regulator underneath the dome of the storage tank. Plaintiffs attempted to introduce into evidence plaintiffs' Exhibit No. 24, a photograph allegedly depicting a re-creation of the scene found by Ronnie Hewitt.

The plaintiffs' sole point on appeal is the trial court erred in not allowing them to introduce into evidence plaintiffs' Exhibit 24, a photograph of a plastic cup over the regulator on plaintiffs' LP gas storage tank and in not allowing plaintiffs to introduce evidence that Holder, manager of Sikeston, instructed employee Logsdon to place a cup or some type of device over the vent of the regulator. By their point, plaintiffs contend:

"Said evidence was admissible because [defendants'] defense was that no defect in the tank and regulator system existed at all and, further, said evidence tended to show that the vent screen and regulator were, in fact, frozen at some time during the period prior to the arrival of employees Holder and Logsdon on the scene March 7, 1989."

In their argument under this point, plaintiffs acknowledge the general rule against the admission of evidence of "subsequent remedial action". That rule has received the following expressions:

" '[I]t is the general rule that, where a dangerous, defective, or improper place, method, or appliance is alleged to have resulted in an injury for which damages are sought to be recovered, evidence that, subsequent to the accident or injury complained of, changes or repairs thereof or thereto were made by the person charged or precautions to prevent recurrence of injury were taken by him, is inadmissible to show antecedent negligence or as an admission of negligence on the particular occasion in question * * * but such evidence may be admissible for other purposes, * * *.' 65 C.J.S. Negligence § 225a[.]" *Atcheson v. Braniff International Airways*, 327 S.W.2d 112, 116 (Mo.1959). (Omission in original.)

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." Fed. R.Evid. 407.

Also see Annot., *Subsequent Remedial Measures*, 50 A.L.R.Fed. 935 (1980); 22 Mo.Prac., *Evidence*, § 407 (1992). Examples of such "other purposes" to which such evidence may be admissible are further delineated in the authorities cited in this opinion. Plaintiffs argue the photograph and testimony were admissible as an exception to the general rule, not to show negligence but for the "other purpose" of showing the condition of the tank and that there was a defect. Further, favorably construing their argument, they urge the evidence was admissible to show it was possible for the regulator on the tank to freeze.

The plaintiffs' point and argument misconceives the basic issues in the case. For obvious reasons, the plaintiffs did not seek to hold either defendant liable as a supplier of a product or chattel on a theory of negligence or strict liability. The plaintiffs alleged "said appliance [the tank] was in a dangerous and defective condition in that there was a hole cut into the top of the dome which allowed the introduction of precipitation (frozen and unfrozen), moisture and other elements of the weather to the regulator for said tank." The relevant allegations of the petition alleged Sikeston and Empire Gas were liable because they failed to warn the plaintiffs of the danger in using the tank "in its dangerous and defective condition as aforesaid" and failed to warn them the tank was dangerous and defective "as a result of the hole in the top of the dome". The verdict directing instruction against Sikeston predicated its liability upon such failure to warn. The petition further alleged Empire Gas was negligent in failing to train the employees of Sikeston "to detect defective appliances such as that described in this Petition". The verdict director against Empire Gas predicated its liability upon its failure to train employees of Sikeston to warn plaintiffs a tank with a hole in the top of the

dome was defective and not reasonably safe.

The issue in this case is not whether or not there was a hole in the dome. The manufactured hole was obvious and conceded to exist. Nor was the issue whether or not ice could freeze on the regulator or if the vent was in fact frozen. The issue concerning Sikeston is whether or not its employees were negligent in not determining the hole made the tank dangerous and defective. The issue concerning Empire Gas is whether or not it was negligent in failing to train employees of Sikeston. The tendered evidence was not relevant for a purpose which made it admissible as an exception to the general rule. The only relevancy of the photograph and tendered testimony would be to establish the conduct of the defendants in the respects alleged constituted culpable negligence. It is that purpose the rule forbids. Such a subsequent measure, placing the cup over the vent, "is not admissible to prove negligence or culpable conduct in connection with the event." Fed.R.Evid. 407. Cf. *Diversified Metals Corp. v. Aaron Ferer & Sons, Inc.*, 498 S.W.2d 783 (Mo.1973); *Atcheson v. Braniff International Airways*, 327 S.W.2d 112 (Mo.1959); *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560 (11th Cir.1991). Also see Annot., *Products Liability—Subsequent Warnings*, 38 A.L.R.4th 583 (1985); Annot., *Products Liability–Subsequent Repairs*, 74 A.L.R.3d 1001 (1976); Annot., *Subsequent Remedial Measures*, 50 A.L.R.Fed. 935 (1980).

The trial court did not err in refusing to admit the photograph and tendered testimony. The judgment is affirmed.

SHRUM, P.J., and MONTGOMERY, J., concur.